[Civ. No. 4827.   Fourth Dist.   July 20, 1954.]

E. JEROME BILYEU, Appellant, v. THE CITY OF SAN DIEGO, Respondent.

Nottbusch & Nottbusch and Frank H. Nottbusch, Jr., for Appellant.

Jean F. DuPaul, City Attorney, Aaron Reese, Deputy City Attorney, McInnis & Hamilton and John W. McInnis for Respondent.

BARNARD, P. J.—This is an action for damages arising from an automobile collision.  A jury returned a verdict in favor of the defendant and the plaintiff has appealed from the judgment.

The accident occurred about 9 a. m. on October 17, 1951, at the intersection of Ash Street and Cabrillo Freeway in

San Diego. This freeway runs north and south, having two lanes for southbound traffic which are separated from the lanes for northbound traffic by a strip which is 54 feet wide. Ash street comes into this freeway from the west but does not cross it. There are islands at this intersection forming so-called "slots," one of which permits northbound traffic on the freeway to make a circular turn to the left and enter Ash Street, and another of which permits traffic from Ash Street to make a similar left turn and enter the northbound lanes of the freeway.

Traffic at this intersection is controlled by a system of mechanical signals. Those material here are the ones regulating traffic coming north on the freeway and turning across the southbound lanes of the freeway in order to proceed west on Ash Street, and regulating traffic coming from Ash Street and crossing the southbound lanes in order to proceed north on the freeway. Two signals which are always red face a northbound driver on the freeway who turns into the slot leading to Ash Street. When another red light stops southbound traffic on the freeway two green arrows, which stay on for an interval of 12 seconds, permit a driver in this slot to cross those southbound lanes and proceed west on Ash Street. When those green arrows go off another green light comes on simultaneously, which permits a driver coming from Ash Street to cross the southbound lanes and to proceed north on the freeway.

Another street, Russ Boulevard, comes into the freeway from the east, about 120 feet south of the Ash Street intersection. On this occasion the plaintiff entered the freeway from Russ Boulevard and traveled north. He testified that as he entered the freeway from Russ there were no cars north of him on the freeway, but that he saw two cars moving into Ash Street; that as he turned into the slot, preparatory to going into Ash Street, he saw the defendant's car where it was stopped, near the west edge of the southbound lanes of the freeway; that he saw the green arrows as he turned into this slot; that he never stopped after he left Russ Boulevard until after the accident; that he was in high gear and going 15 miles an hour as he entered the intersection, and also at the time of the collision; that he stopped his car within 15 feet after the accident; that the green arrows on the two signal lights were showing all the time he was making his left turn, and as he crossed the east line of the southbound lanes of the freeway; and that he did not see the defendant's car in motion

at any time. He further testified that he was familiar with this intersection, had traveled it frequently and knew that the green arrows stayed on so many seconds and then went off.

The defendant's automobile was driven by one of its employees, Mr. Hager. He had approached on Ash Street and stopped at the westerly edge of the southbound lanes of the freeway, waiting for the green signal permitting him to cross those lanes and proceed north on the freeway. He started up and was proceeding in low gear at about 5 miles an hour when his front left fender came in contact with the right rear fender of the plaintiff's car. The collision occurred approximately on the center line between the southbound lanes of the freeway, and approximately at the center line (extended) of Ash Street. Each car had traveled about 12 feet after it entered the southbound lanes of the freeway. The defendant's car had traveled about 14 feet from the place where it had stopped, and the plaintiff's car had traveled about 18 feet from the place where it should have stopped if the green arrows were not then showing. It was, and is, the plaintiff's contention that the green arrows were showing at the time he passed that point.

Hager testified that as he came to this intersection on Ash Street he saw the red light against him and stopped his car; that while he waited for the green signal three cars passed in front of him and entered Ash Street; that when his signal turned green he proceeded into the intersection; that at that· time there were no cars in the intersection and he saw none entering it; that he proceeded in low gear; that as he was making his left turn toward the slot leading to the northbound lanes of the freeway he was watching directly ahead all the time; that he traveled about 8 or 10 feet before he saw the defendant's car; that he applied his brakes; and that there was then a slight impact. There was evidence that no skid marks were left by either car except light marks at the point of impact, showing that the rear wheels of the plaintiff's car had been moved sideways about 2 feet.

An eyewitness to the accident, who was in a car just behind the defendant's car, testified that the green light was showing at the time the defendant's car entered the intersection, and that the plaintiff's car had not come into the intersection at that time but was still in the slot, about halfway between the entrance to the slot and the intersection. It could be inferred from this testimony that the green arrows were not on when the plaintiff entered the intersection since those signals went

off simultaneously with the coming on of the other green light, for which the driver of the defendant's car had waited.

█ The appellant first contends that the evidence shows, as a matter of law, that the driver of the respondent's car was guilty of negligence which was the proximate cause of the accident, and that there was no evidence to support a finding of contributory negligence on his own part. It is argued that Hager was negligent since he failed to see the appellant's car which was already within the intersection at the time Hager started his car in motion; and that the evidence shows, without contradiction, that the appellant was operating his car in a reasonable and ordinary manner.

Under the theory relied on by the appellant, that he entered the intersection just before the green arrows went off, it would be almost impossible for the accident to have happened. Since he was traveling in high gear at 15 miles per hour he should cover the 18 feet to the point of the collision before Hager could reach it, from a standing start, and traveling some 14 feet in low gear and at about five miles per hour. In any event the evidence, with the reasonable inferences therefrom, supports the conclusion that the driver of respondent's car entered the intersection only when the green light in his favor came on, and that the appellant entered the intersection after the green arrows had gone off. There is also evidence indicating that the appellant traveled some 20 or 30 feet after the green arrows went off before he entered the intersection. Questions of fact were presented, which were for the jury, and it neither can be held as a matter of law that the driver of respondent's car was negligent nor that the evidence was not sufficient to show negligence on the part of the appellant. While some conflict appears, the evidence is sufficient to support the verdict.

█ It is further contended that the court erred in refusing, as covered and as argumentative, an instruction requested by the appellant, which reads:

"Under certain circumstances, the law excuses disobedience to a mechanical traffic signal. One such circumstance is in any emergency in which a person of ordinary prudence, situated as the person in question, or would be likely to, or reasonably might, disobey the signal. Where often traffic signals have two signs only, "stop" and "go" with no preliminary warnings of change, strict compliance with the letter of the law in every instance would be almost impossible of achievement and bona fide efforts to effect such compliance

would tend to defeat one of the principal purposes of the law. Traffic signals are not installed to retard traffic—on the contrary their principal purpose, along with promoting safety for users of highways generally, is to expedite traffic movement.''

It is argued that this instruction defined the word ''emergency'' as contained in subdivision (f) of section 476 of the Vehicle Code; that by failing to give this instruction the court failed to instruct the jury in that regard; and that this obviously confused the jury as to the rights of the parties.

The first two sentences of the requested instruction were adequately covered in another instruction which was given, and the last two sentences were clearly argumentative. The court read to the jury all of section 476 of the Vehicle Code, including subdivision (f). It also gave this instruction:

''In respect to traffic on the cross street, not already within the intersection, the driver who enters the intersection on a Go or Caution signal and who, himself, is exercising ordinary care, has a right to assume that such cross-traffic will not proceed into the intersection against the Stop sign, and hence he is not required before entering or while crossing to look out for such cross-traffic as could endanger him only by violating the Stop signal. However, such a driver, although he has the right of way, may not ignore danger apparent to him; and his duty is to exercise ordinary care to avoid a collision whenever he perceives that another vehicle has entered or is about to enter the intersection against a Stop signal.

''Under certain circumstances, the law excuses disobedience to a mechanical traffic signal. One such circumstance is when, from the viewpoint of the driver involved, disobeying a signal is necessary to avoid a collision and would appear to be so necessary to a reasonably prudent person in the same situation. Another such circumstance is any other emergency in which a person of ordinary prudence, situated as the person in question, would, or would be likely to, or reasonably might, disobey the signal.''

These instructions adequately covered any possible issues in this connection, and neither error nor prejudice appears.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.